# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Securities and Exchange Commission,<br><br>               Plaintiff,<br><br>   -against-<br><br>Mark Klein,<br>Eduardo Rubinstein, and<br>Pablo Rubinstein,<br><br>               Defendants | 22 Civ. 6426 (LGS)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CIVIL PENALTIES** |

      Defendants Eduardo Rubinstein and Mark Klein sold stock based on material, nonpublic information. Rubinstein learned negative news about a biopharmaceutical company's flagship drug from his brother, a corporate insider. Before the bad news became public—causing the company's stock price to plummet—Eduardo Rubinstein sold more than 100,000 shares of stock; he also passed the tip to his son-in-law, Mark Klein, who likewise unloaded his shares of the company's stock. By selling their stock based on inside information unknown to other investors and the markets, Rubinstein and Klein avoided suffering losses of more than $430,000.

      Rather than litigate the merits of the case against them, Eduardo Rubinstein and Mark Klein entered into bifurcated settlements. Pursuant to their consents, Defendants agreed that they would not argue that they did not violate the federal securities laws, as alleged in the Complaint; they agreed to pay civil penalties in amounts to be determined by the Court; and they agreed that, for purposes of determining the appropriate civil penalties, the allegations of the Complaint are to be taken as true. The Court approved the bifurcated settlements and entered the partial judgments to which Defendants consented.

      The Securities and Exchange Commission ("SEC," or "Commission") now moves to assess civil penalties against Eduardo Rubinstein and Mark Klein for their illegal insider trading.

Congress, in recognition of the serious harm that insider trading causes to the legitimacy of the capital markets and investors' faith in the fairness and integrity of the securities markets, has provided for civil penalties of up to three times the profits gained or losses avoided as a result of unlawful insider trading. 15 U.S.C. § 78u-1(a)(2).

In this case, the SEC asks the Court to impose civil penalties below the statutory maximum but sufficient to effect Congress's two-fold purpose of punishing and deterring insider trading. Specifically, the SEC requests that the Court order Eduardo Rubinstein to pay a civil penalty of $875,216, which is two-and-a-half times his losses avoided plus one-and-a-half times the losses Klein avoided by trading on Eduardo's tip. The SEC asks the Court to impose a civil penalty of $517,435 on Klein, representing two-and-a-half times the losses Klein avoided by trading on material, nonpublic information. These penalty amounts are consistent with the securities laws' punitive and deterrent purposes for insider trading offenses and appropriate under the facts and circumstances of this case.

## BACKGROUND

**Summary**: This action involves insider trading by Eduardo Rubinstein and Mark Klein in the securities of Ampio Pharmaceuticals, Inc. ("Ampio"). Eduardo Rubinstein and Mark Klein traded based on material, nonpublic information unlawfully disclosed by Pablo Rubinstein, an Ampio advisor and Eduardo's brother.[1] On August 7, 2018, Ampio announced that the U.S. Food and Drug Administration ("FDA") had concluded that Ampio's clinical study for one of Ampio's flagship developmental drugs was not adequate and well-controlled. As an Ampio advisor, Pablo Rubinstein knew about the FDA's negative conclusion before it was announced to

---

[1] Pablo Rubinstein consented to entry of judgment against him, ECF No. 9-2, which the Court entered on August 1, 2022, ECF No. 10.

the public. In breach of his duty to Ampio, Pablo Rubinstein passed that inside information to his brother Eduardo, whom Pablo knew owned Ampio stock. Eduardo Rubinstein, in turn, tipped Mark Klein—Eduardo's son-in-law—whom Eduardo Rubinstein knew also owned Ampio stock. *See* Compl. (ECF No. 1) ¶¶ 1-2.

Following Ampio's announcement of the FDA's conclusion that the clinical study for Ampio's flagship drug was not adequate and well-controlled, the price of Ampio's stock fell more than seventy-five percent. But Eduardo Rubinstein and Mark Klein did not suffer losses along with Ampio's other investors. That is because the day before Ampio's announcement, armed with inside information received from Pablo Rubinstein, Eduardo Rubinstein sold nearly all of his Ampio stock (more than 100,000 shares) and Mark Klein sold all of his Ampio stock (100,000 shares). By selling stock based on material, nonpublic information, Eduardo Rubinstein and Mark Klein avoided losses of $225,902 and $206,974, respectively. *See id.*

**Ampio and Pablo Rubinstein**: Ampio is a biopharmaceutical company focused primarily on the development of drug therapies to treat prevalent inflammatory conditions. *Id.* ¶ 12. During the relevant time period, Ampio's flagship, developmental drug was Ampion, a biologic drug therapy designed to conditions such as osteoarthritis; Ampio was seeking FDA approval for a Biologics License Application ("BLA"), which would have permitted Ampio to market and distribute Ampion in the United States. *Id.* ¶ 17.

Pablo Rubinstein was a member of Ampio's Scientific Advisory Board, in which capacity he provided guidance regarding Ampio's developmental drugs and advised on clinical studies and regulatory discussions concerning those drugs. *Id.* ¶¶ 13-14. To perform those duties, Pablo Rubinstein was regularly entrusted with material, nonpublic information concerning Ampio, its developmental drugs, Ampio's clinical studies for those drugs, and its interactions

3

with the FDA. *Id.* ¶ 14. Pablo Rubinstein agreed to, and owed a duty to Ampio to, hold such information in the strictest confidence and not to disclose it to anyone. *Id.* ¶¶ 15-16.

But, Pablo Rubinstein did not safeguard Ampio's material, nonpublic information, and he breached his duty of confidentiality to Ampio. In July 2018, Ampio's Chief Executive Officer ("CEO") and other executives met with the FDA in an effort to persuade the FDA that one of the clinical studies Ampio conducted to support a BLA for Ampion was adequate and well-controlled. *See id.* ¶¶ 17-23. Pablo Rubinstein knew that the FDA had concerns about the clinical study, and he helped prepare Ampio's CEO for the meeting with the FDA. *Id.* ¶ 22. Following the meeting, the FDA remained unpersuaded, and, on August 3, 3018, the FDA sent Ampio a letter stating that the FDA did not consider the clinical trial to have been adequate and well-controlled and could not, therefore, support a successful BLA. *Id.* ¶ 24. Ampio's CEO sent Pablo Rubinstein a copy of the letter from the FDA shortly after receiving it. *Id.* ¶ 25. Pablo Rubinstein knew that submission of a successful BLA would be a significant milestone for Ampio and that the FDA's conclusion that the clinical study was not adequate and well-controlled sufficient to support a successful BLA would have a material impact on Ampio and its stock price. *Id.* ¶ 26. Pablo Rubinstein also knew that the letter from the FDA was nonpublic, and communicated with Ampio's CEO and one of its Directors about disclosing the FDA's findings to the investing public. *Id.* ¶¶ 26-27.

Ampio publicly disclosed the FDA's conclusions that the clinical study was not adequate and well-controlled sufficient to support a successful BLA after markets closed on August 7, 2018. *Id.* ¶ 28. The public disclosure had a material, negative impact on Ampio's stock price: on August 7, 2018, Ampio's stock closed at $2.86 per share; the next day, following the public

announcement, Ampio's stock closed at $0.61 per share, a decrease of $2.25 per share, or 78.71%. *Id.* ¶ 29.[2]

**Pablo Rubinstein tips Eduardo Rubinstein**: Before Ampio released the FDA's conclusions to the public, Pablo Rubinstein shared them with his brother Eduardo. *Id.* ¶ 37. Pablo and Eduardo Rubinstein have a close, personal relationship and communicate frequently by telephone and email. *Id.* ¶ 30. The brothers have a long history of communicating about Ampio and its publicly traded securities, and Pablo Rubinstein communicated nonpublic information about Ampio and its clinical studies to Eduardo Rubinstein on multiple occasions. *Id.* ¶¶ 31-32. At the time of these communications, Eduardo Rubinstein knew that his brother Pablo worked for Ampio and had material, nonpublic information about Ampio and its clinical studies, and Pablo Rubinstein knew that his brother Eduardo held and traded Ampio securities. *Id.* ¶¶ 30-31. In the days after receiving the FDA letter on August 3, 2018, the Rubinsteins had six telephone conversations lasting a minute or more: on Saturday, August 4, they had three calls; on Sunday, August 5, they had one 10-minute call; and on the morning of Monday, August 6, the brothers had two calls. *Id.* ¶ 37. On one or more of those calls, Pablo Rubinstein tipped Eduardo Rubinstein with material, nonpublic information concerning the FDA's negative conclusion about the clinical study and Ampio's impending public disclosure of that information. *Id.*

**Eduardo Rubinstein trades on material, nonpublic information**: Based on the inside information received from his brother, Eduardo Rubinstein liquidated nearly all of his Ampio holdings on August 6, 2018. *Id.* ¶ 38. At 9:39 a.m. ET—less than one minute after his second call that day with his brother—Eduardo Rubinstein attempted to call the brokerage firm where he

---

[2] Ampio's common stock is publicly traded on the NYSE American exchange under the symbol "AMPE." Compl. ¶ 12.

and his wife had accounts; a minute later, at 9:40 a.m. ET, Eduardo Rubinstein spoke with a representative from the brokerage firm and sold 95,000 shares of Ampio stock held in a joint account with his wife. *Id.* ¶ 39. Later that day, Eduardo Rubinstein sold 8,226 shares of Ampio stock held in retirement accounts in his name and his wife's name. *Id.* ¶ 40. In total, Eduardo Rubinstein sold 103,226 shares of Ampio stock based on material, nonpublic information that he received from his brother, and, as a result of those sales, Eduardo Rubinstein avoided losses of approximately $225,902. *Id.*

**Eduardo Rubinstein tips Mark Klein**: Eduardo Rubinstein did not just trade on material, nonpublic information about Ampio in his and his wife's accounts; he also tipped his son-in-law, Mark Klein, with the same inside information. *See id.* ¶¶ 34-37. Mark Klein and Eduardo Rubinstein have a close, personal relationship and communicate frequently by text message and other means. *Id.* ¶ 33. They have a history of communicating about Ampio, its securities, and its dealings with the FDA, and many of these communications contained material, nonpublic information about Ampio that Eduardo Rubinstein received from his brother Pablo. *Id.* ¶¶ 34-36. Eduardo Rubinstein knew that Klein owned Ampio stock, and Klein knew that Pablo Rubinstein worked for and had nonpublic information about Ampio that he shared with Eduardo Rubinstein. *Id.* ¶¶ 2, 33.

On the morning of August 6, 2018, one minute after completing the call with his brokerage firm, Eduardo Rubinstein telephoned Klein and unlawfully communicated to Klein the material, nonpublic information concerning the FDA's negative conclusions about the clinical study and impending public disclosure of that information. *Id.* ¶ 41.

**Mark Klein trades on material, nonpublic information**: Minutes later, Mark Klein logged into his online brokerage account and attempted to sell all 100,000 shares of Ampio stock

6

that he owned. *Id.* ¶ 42. After attempting to sell his Ampio stock for more than the market price for over an hour, Klein entered a market order and, within 30 seconds, sold his entire position of Ampio stock. *Id.* ¶¶ 42-43. By selling his Ampio stock based on material, nonpublic information that his father-in-law unlawfully conveyed to him, Mark Klein avoided losses of $206,974. *Id.* ¶¶ 43-44.

**Defendants violated the federal securities laws**: By engaging in the conduct alleged in the Complaint and summarized above, Eduardo Rubinstein and Mark Klein engaged in unlawful insider trading in violation of: (1) Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and (2) Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a).

**Defendants offer to settle and not contest liability**: Following preliminary discovery, Defendants offered to enter into bifurcated settlements pursuant to which they, without admitting or denying the SEC's allegations except for purposes of this motion, consented to the entry of judgments against them enjoining them from further violations of the securities laws and imposing civil penalties up to certain amounts, with the amounts of the civil penalties to be determined by the Court. *See* ECF Nos. 36-1, 36-3 (consents); *see also* ECF No. 34 (notifying the Court of Defendants' offers). The Commission accepted Defendants' offers, ECF No. 36, and the Court entered the partial judgments to which Defendants consented, ECF Nos. 37 (Judgment as to Eduardo Rubinstein), 39 (Judgment as to Mark Klein). Pursuant to their consents and the Court's Judgements, Defendants are precluded from arguing that they did not violate the federal securities laws as alleged in the Complaint, and, for purposes of determining the appropriate amount of civil penalties, the allegations in the Complaint are taken as true. ECF Nos. 36-1 ¶ 3, 36-3 ¶ 3, 37 at 3, 39 at 3.

# IMPOSITION OF CIVIL PENALTIES

Eduardo Rubinstein and Mark Klein have consented to the awards of civil penalties against them. In light of the facts and circumstances of this case, the SEC requests that the Court order Eduardo Rubinstein to pay a civil penalty of $875,216, representing two-and-a-half times his own losses avoided and one-and-a-half times Klein's losses avoided. And the SEC asks that the Court impose on Klein a civil penalty of $517,435, representing two-and-a-half times the losses Klein avoided by trading on inside information.

**The requested penalties are consistent with Congress's purposes of punishing and deterring insider trading**: The Exchange Act authorizes the SEC to seek civil penalties from those who violate the federal securities laws by buying or selling securities while in possession of material, nonpublic information, or communicating material, nonpublic information in connection with such a purchase or sale. 15 U.S.C. § 78u-1(a)(1). The amount of civil penalties is left to the discretion of the Court, "in light of the facts and circumstances," up to three times the profit gained or loss avoided as a result of such unlawful conduct. *Id.* § 78u-1(a)(2). Congress first enacted insider-trading-specific penalty provisions providing for penalties of up to three times profit gained or loss avoided in the Insider Trading Sanction Act of 1984, Pub. L. No. 98-376, "to remedy the inadequate deterrent provided by present enforcement remedies for insider trading," *SEC v. Falbo*, 14 F. Supp. 2d 508, 528 (S.D.N.Y. 1998) (internal quotations omitted). Four years later, in the Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. No. 100-704, Congress broadened the penalty provisions to "enhance deterrence against insider trading, and where deterrence fails, to augment the current methods of detection and punishment of this behavior," H.R. Rep. No. 100–910, at 7 (1988).

The SEC respectfully submits that the requested penalties, while below the statutory maximum,³ are nonetheless appropriate to effect the securities laws' dual purposes of punishment and deterrence for insider trading offenses. To be punitive, the civil penalty amounts must be greater than just the Defendants' ill-gotten gains (in profits or losses avoided), the return of which "merely restores a defendant to his original position without extracting a real penalty for his illegal behavior." *Falbo*, 14 F. Supp. 2d at 528 (internal quotations omitted). Deterrence, likewise, requires that civil penalties "make insider trading a money-losing proposition." *SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019); *see also SEC v. Rajaratnam*, 822 F. Supp. 2d 432, 434 (S.D.N.Y. 2011) ("SEC civil penalties, most especially in a case involving such lucrative misconduct as insider trading, are designed, most importantly, to make such unlawful trading a money-losing proposition not just for this defendant, but for all who would consider it, by showing that if you get caught . . . you are going to pay severely in monetary terms.") (internal quotation omitted).

As for Eduardo Rubinstein, the civil penalty assessed against him must take into account not only his losses avoided, but also the losses avoided by Klein, to whom Eduardo communicated material, nonpublic information. *See* 15 U.S.C. § 78u-1(a)(2) (providing for civil penalties up to "three times the profit gained or loss avoided as a result of such unlawful purchase, sale, *or communication*") (emphasis added).⁴ As the Second Circuit has explained,

---

³ The statutory maximum penalty for Eduardo Rubinstein is $1,298,628—three times his losses avoided plus three times the losses avoided by Klein due to Klein's trading based on material nonpublic information provided to him by Eduardo Rubinstein. The statutory maximum penalty for Klein is $620,922—three times his losses avoided by trading on inside information.

⁴ Pablo Rubinstein, the source of the material, nonpublic information regarding Ampio, is not alleged to have traded on inside information. *See generally* Compl. Pablo Rubinstein agreed to settle before this case was filed, and the consent judgment against him includes a civil penalty of $225,902.25, ECF No. 10 at 3, which is equal to the losses avoided by his brother/tippee, Eduardo Rubinstein, Compl. ¶ 40.

"[t]he purpose of Section 21A [of the Exchange Act, 15 U.S.C. § 78-1(a)] is to deter the whole of the conduct [Defendant] engaged in by exacting a penalty for it. . . . [A]n appropriate penalty must be keyed to the total scope of the scheme." *Rajaratnam*, 918 F.3d at 44. In this case, Eduardo Rubinstein's penalty must be keyed to both his own trading and tipping Klein so he too could engage in insider trading.

The SEC asks that the Court impose the requested penalties—for Eduardo Rubinstein, two-and-a-half times his losses avoided and one-and-a-half times the losses avoided by his tippee, and for Klein, two-and-a-half times his losses avoided—because they will punish Defendants for their wrongdoing and deter future insider-trading offenses.

**The requested penalties are appropriate "in light of the facts and circumstances"**: In addition to punishing and deterring Defendants' conduct, the penalties are appropriate "in light of the facts and circumstances" of this case. 15 U.S.C. § 78u-1(a)(2). Courts in this district frequently look to the following factors in setting civil penalties, including in insider trading cases:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Rajaratnam*, 918 F.3d at 45 (internal quotation omitted). While these factors may be instructive, they are not "exhaustive" and "are not to be taken as talismanic." *Id.* Nonetheless, these factors weigh in favor of the substantial, but less-than-maximum, penalties requested by the SEC.

**Egregiousness**: "Insider trading is a flagrant, deliberate, and serious violation of the federal securities law," *SEC v. Gunn*, No. 3:08-cv-1013-G, 2010 WL 3359465, at *4 (N.D. Tex. Aug. 25, 2010); *see also* BLACK'S LAW DICTIONARY 229 (2d pocket ed. 2001) (defining "egregious" as, *inter alia*, "flagrant"). Congress recognized the seriousness of insider trading

10

offenses in twice amending the federal securities laws to enhance the penalties to be assessed against those who engage in them. *Supra* at 8-10. Here, Defendants engaged in classic insider trading: taking from a corporate insider known material, nonpublic information that would have an obvious impact on the price of the security and trading shortly before that information was made public. Accordingly, this factor tips in favor of the substantial, but non-maximum, penalties sought by the SEC.

**Scienter**: Defendants acted with scienter. Eduardo Rubinstein knew that his brother was sharing material, nonpublic information with him that was "Hiighly [sic] confidential!" Compl. ¶ 32. After learning from Pablo Rubinstein about the FDA's negative views of the Ampion clinical study and impending public disclosure, Eduardo Rubinstein sold nearly all of his and his wife's shares of Ampio stock. *Id.* ¶¶ 37-40. And, after liquidating his own shares based on inside information, Eduardo Rubinstein called his son-in-law, Mark Klein, to pass the information so that Klein, too, could trade on it. *Id.* ¶ 41. Klein, like Eduardo Rubinstein, understood the value of this inside information and acted almost immediately to liquidate his entire position in Ampio. *Id.* ¶¶ 41-43. At the time of their sales, Eduardo Rubinstein and Mark Klein knew, consciously avoided knowing, or were reckless in not knowing that the information on which they based their trades was material and nonpublic and had been disclosed to them in breach of a duty of trust and confidence for a personal benefit. *Id.* ¶¶ 51-52, 54. Defendants' scienter weighs in favor of imposing the requested penalties.

**Loss creation**: Defendants' conduct created substantial losses to other market participants who—unlike Eduardo Rubinstein and Mark Klein—did not have the benefit of inside information about Ampio when they purchased the stock that Rubinstein and Klein sold. As Congress explained in strengthening the penalties for insider trading, those who trade without

11

the benefit of material, nonpublic information lose at the expense of those who trade with such information, undermining the fair and honest operation of the securities markets and fomenting the notion that the markets are rigged against honest participants:

> Insider trading damages the legitimacy of the capital market and diminishes the public's faith. The investing public has a legitimate expectation that the prices of actively traded securities reflect publicly available information about the issuer of such securities. According to this view, the small investor will be—and has been—reluctant to invest in the market if he feels it is rigged against him.

H.R. Rep. 100-910, at 8. Here, as Eduardo Rubinstein and Mark Klein well knew, they sold their shares before Ampio publicly announced the FDA's negative views regarding the Ampion clinical study. Because the price of the stock when Defendants sold did not reflect this information, Rubinstein and Klein profited at expense of those who bought their shares—the value of which plummeted as soon as the inside information Rubinstein and Klein had when they sold became public. Defendants' gains at the expense of other market participants weighs in favor of the requested civil penalties.

**Recurrent conduct**: While the SEC has asserted claims arising out of only one series of trades by each Defendant, the conduct underlying their insider trading—soliciting and receiving material, nonpublic information about Ampio from Pablo Rubinstein, and discussing that information in the context of Ampio's stock price—was recurrent. Pablo and Eduardo Rubinstein have a long history of communicating about Ampio and its stock, including the sharing of material, nonpublic information. Compl. ¶¶ 31-32. Eduardo Rubinstein routinely shared the inside information he learned from his brother with his son-in-law, Mark Klein. *Id.* ¶¶ 33-36. And, together, Mark Klein and Eduardo Rubinstein followed Ampio's stock price while discussing the material, nonpublic information learned from Pablo Rubinstein. *See id.* While those discussions may have culminated in a single set of sales, the sharing of material, nonpublic

information and monitoring its likely impact on Ampio's stock price was recurrent and tips in favor of the requested penalties.

**Financial condition**: Finally, Defendants are not entitled to a reduction of the requested penalties based on any "demonstrated current and future financial condition." *Rajaratnam*, 918 F.3d at 45. Mark Klein has not submitted an accounting and will not argue that he is unable to pay the requested penalty. *See* ECF No. 42 at 1 n.1. The accounting provided by Eduardo Rubinstein demonstrates that he has sufficient assets to satisfy a monetary judgment in the amount of the civil penalty requested by the SEC. His argument, it appears, will not be that he cannot pay, but that he has structured his assets (by, for example, placing them in a revocable trust) so that he does not have to pay what this Court orders him to pay. Whatever merit, if any,[5] such arguments may have in a subsequent collection action, they do not support reducing the amount of the civil penalty to be assessed against Eduardo Rubinstein in this case. To the contrary, reducing a civil penalty because someone who engages in illegal insider trading claims that his wealth is shielded from this Court's judgments—by a revocable trust, because it is tied up in Florida real estate, or otherwise—would encourage wrongdoers to engage in insider trading and try to shelter their ill-gotten gains and would undermine the securities laws' purposes of punishment and deterrence.

In sum, the SEC respectfully submits that the facts and circumstances of this case call for penalties that are substantial—$875,216 for Eduardo Rubinstein and $517,435 for Mark Klein—yet still below the statutory maximum.

---

[5] *See, e.g.*, FLA. STAT. § 736.0505(1)(a) (2022) ("The property of a revocable trust is subject to the claims of the settlor's creditors during the settlor's lifetime to the extent the property would not otherwise be exempt by law if owned directly by the settlor.").

Respectfully submitted: May 26, 2023

*s/ Ian J. Kellogg*
Ian J. Kellogg
Mark L. Williams
Frank D. Goldman

*Attorneys for Plaintiff Securities and Exchange Commission*