USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/08/2023

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Securities and Exchange Commission,<br><br>                              Plaintiff,<br><br>           -against-<br><br>Mark Klein, et al.,<br><br>                              Defendants. | 1:22-cv-06426 (LGS) (SDA)<br><br>**REPORT AND RECOMMENDATION** |

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE LORNA G. SCHOFIELD, UNITED STATES DISTRICT JUDGE:**

Plaintiff, the Securities and Exchange Commission ("Plaintiff" or the "SEC"), brought this insider-trading action on July 28, 2022 against Mark Klein ("Klein"), Eduardo Rubenstein ("Eduardo") and Pablo Rubenstein ("Pablo"), pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 and Sections 21(d), 21(e), 21A and 27 of the Securities Exchange Act of 1934 (the "Exchange Act"). (Compl., ECF No. 1, ¶ 5.) On August 1, 2022, a final judgment on consent was entered against Pablo by which he, among other things, agreed to pay to the SEC a civil penalty in the amount of $225,902.25. (8/1/22 Judg., ECF No. 10, at 3.) On April 18, 2023, a judgment on consent was entered against Eduardo, which provided, among other things, that Eduardo shall pay a civil penalty, pursuant to Sections 21A of the Exchange Act, in an amount up to $875,216 to be determined by the Court, upon motion made by the SEC. (4/18/23 Eduardo Judg., ECF No. 37, at 3.) Also on April 18, 2023, a judgment on consent was entered against Klein, which provided, among other things, that Klein shall pay a civil penalty, pursuant to Section 21A of the Exchange Act, in an amount up to $517,435 to be determined by the Court, upon motion made by the SEC. (4/18/23 Klein Judg., ECF No. 39, at 3.)

Pending before the Court is the SEC's motion for civil penalties against Eduardo in the amount of $875,216 and against Klein in the amount of $517,435.[1] (Pl.'s Mot., ECF No. 44.) For the reasons set forth below, it is respectfully recommended that the SEC's motion be GRANTED IN PART and DENIED IN PART.

**RELEVANT FACTS**[2]

This action arises out of insider trading by Eduardo and Klein in the securities of Ampio Pharmaceuticals, Inc. ("Ampio") based on material nonpublic information unlawfully disclosed by Pablo, a scientific advisor to Ampio. (Compl. ¶ 1.)

**Ampio's Business**

Ampio is a biopharmaceutical company focused primarily on the development of drug therapies to treat prevalent inflammatory conditions. (Compl. ¶ 12.) Ampio's common stock is publicly traded on the NYSE American exchange under the symbol "AMPE." (*Id*.)

During 2017 and 2018, Ampio's business primarily was focused on the development of Ampion, a biologic drug therapy designed to treat inflammatory conditions, such as osteoarthritis of the knee. (Compl. ¶ 17.) At that time, Ampio was attempting to submit a successful Biologics

---

[1] The SEC's motion was supported by a memorandum of law. (Pl.'s Mem., ECF No. 45.) On May 30, 2023, the SEC's motion was referred to this Court for a report and recommendation. (Order of Ref., ECF No. 46.) On June 16, 2023, Klein and Eduardo each filed an opposition memorandum. (Klein Opp. Mem., ECF No. 47; Eduardo Opp. Mem., ECF No. 48.) On June 30, 2023, the SEC filed a reply memorandum. (Pl.'s Reply, ECF No. 49.)

[2] The following facts are taken from the Complaint, which the Court must accept as true under the consent judgments. Each of Eduardo and Klein agreed in their consent judgments that, for purposes of the pending motion, "the allegations of the Complaint shall be accepted as and deemed true by the Court." (4/18/23 Eduardo Judg. at 3; 4/18/23 Klein Judg. at 3.) "When a defendant enters a consent judgment with the [SEC] and agrees not to challenge the details of the [SEC]'s complaint, courts accept the allegations in the complaint to be true when deciding the [SEC]'s subsequent motion for monetary relief." *SEC v. Juno Mother Earth Asset Mgmt., LLC*, No. 11-CV-01778 (TPG), 2014 WL 1325912, at *3 (S.D.N.Y. Mar. 31, 2014).

License Application ("BLA"), which, if approved by the U.S. Food and Drug Administration ("FDA"), would permit Ampio to market and distribute Ampion within the United States. (*Id*.) Over the course of many years, Ampio conducted clinical studies to assess the efficacy of Ampion to support a BLA. (*Id*.)

**Pablo's Involvement With Ampio**

Pablo was a member of Ampio's Scientific Advisory Board, in which capacity he provided guidance regarding Ampio's developmental drugs and advised on clinical studies and regulatory discussions concerning those drugs. (Compl. ¶¶ 13-14.) To perform those duties, Pablo regularly was entrusted with material, nonpublic information concerning Ampio, its developmental drugs, Ampio's clinical studies for those drugs and its interactions with the FDA. (*Id*. ¶ 14.) Pablo agreed to, and owed a duty to Ampio to, hold such information in the strictest confidence and not to disclose it to anyone. (*Id*. ¶¶ 15-16.)

Pablo did not safeguard Ampio's material, nonpublic information, and he breached his duty of confidentiality to Ampio. (*See* Compl. ¶ 32.) In July 2018, Ampio's Chief Executive Officer ("CEO") and other executives met with the FDA in an effort to persuade the FDA that one of the clinical studies Ampio conducted to support a BLA for Ampion was adequate and well-controlled. (*See id*. ¶¶ 17-23.) Pablo knew that the FDA had concerns about the clinical study, and he helped prepare Ampio's CEO for the meeting with the FDA. (*Id*. ¶ 22.) Following the meeting, the FDA remained unpersuaded and, on August 3, 3018, the FDA sent Ampio a letter stating that the FDA did not consider the clinical trial to have been adequate and well-controlled and therefore could not support a successful BLA. (*Id*. ¶ 24.) Ampio's CEO sent Pablo a copy of the letter from the FDA shortly after receiving it. (*Id*. ¶ 25.) Pablo knew that submission of a successful BLA would be a

significant milestone for Ampio and that the FDA's conclusion that the clinical study was not adequate and well-controlled sufficient to support a successful BLA would have a material impact on Ampio and its stock price. (*Id*. ¶ 26.) Pablo also knew that the letter from the FDA was nonpublic, and communicated with Ampio's CEO and one of its Directors about disclosing the FDA's findings to the investing public. (*Id*. ¶¶ 26-27.)

**Ampio's Public Disclosure And Effect On Stock Price**

Ampio publicly disclosed the FDA's conclusions that the clinical study was not adequate and well-controlled sufficient to support a successful BLA after markets closed on August 7, 2018. (Compl. ¶ 28.) The public disclosure had a material, negative impact on Ampio's stock price. (*Id*. ¶ 29.) On August 7, 2018, Ampio's stock closed at $2.86 per share; the next day, following the public announcement, Ampio's stock closed at $0.61 per share, a decrease of $2.25 per share, or 78.71%. (*Id*. ¶¶ 28-29.)

**Pablo Tips Eduardo**

Pablo and Eduardo are brothers. (Compl. ¶ 2.) Pablo and Eduardo have a close, personal relationship and communicate frequently by telephone and email. (*Id*. ¶ 30.) The brothers have a long history of communicating about Ampio and its publicly traded securities, and Pablo communicated nonpublic information about Ampio and its clinical studies to Eduardo on multiple occasions. (*Id*. ¶¶ 31-32.) At the time of these communications, Eduardo knew that Pablo worked for Ampio and had material, nonpublic information about Ampio and its clinical studies, and Pablo knew that Eduardo held and traded Ampio securities. (*Id*. ¶¶ 30-31.)

In the days after receiving the FDA letter on August 3, 2018, Pablo and Eduardo had six telephone conversations lasting a minute or more: on Saturday, August 4, they had three calls;

on Sunday, August 5, they had one 10-minute call; and on the morning of Monday, August 6, they had two calls. (Compl. ¶ 37.) On one or more of those calls, Pablo tipped Eduardo with material, nonpublic information concerning the FDA's negative conclusion about the clinical study and Ampio's impending public disclosure of that information. (*Id*.)

**Eduardo Trades On Material, Nonpublic Information**

Based on the inside information received from Pablo, Eduardo liquidated nearly all of his Ampio holdings on August 6, 2018. (Compl. ¶ 38.) At 9:39 a.m. ET—less than one minute after his second call that day with Pablo—Eduardo attempted to call the brokerage firm where he and his wife had accounts; a minute later, at 9:40 a.m. ET, Eduardo spoke with a representative from the brokerage firm and sold 95,000 shares of Ampio stock held in a joint account with his wife. (*Id*. ¶ 39.) Later that day, Eduardo sold 8,226 shares of Ampio stock held in retirement accounts in his name and his wife's name. (*Id*. ¶ 40.) In total, Eduardo sold 103,226 shares of Ampio stock based on material, nonpublic information that he received from Pablo, and, as a result of those sales, Eduardo avoided losses of approximately $225,902. (*Id*.)

**Eduardo Tips Klein**

Klein is Eduardo's son-in-law. (Compl. ¶ 11.) Klein and Eduardo have a close, personal relationship and communicate frequently by text message and other means. (*Id*. ¶ 33.) They have a history of communicating about Ampio, its securities and its dealings with the FDA, and many of these communications contained material, nonpublic information about Ampio that Eduardo received from his brother Pablo. (*Id*. ¶¶ 34-36.) Eduardo knew that Klein owned Ampio stock, and Klein knew that Pablo worked for and had nonpublic information about Ampio that he shared with Eduardo. (*Id*. ¶¶ 2, 33.) On the morning of August 6, 2018, one minute after completing the

call with his brokerage firm, Eduardo telephoned Klein and unlawfully communicated to Klein the material, nonpublic information concerning the FDA's negative conclusions about the clinical study and impending public disclosure of that information. (*Id*. ¶ 41.)

**Klein Trades On Material, Nonpublic Information**

Shortly after his August 6, 2018 morning call with Eduardo, Klein logged into his online brokerage account and attempted to sell all 100,000 shares of Ampio stock that he owned. (*See* Compl. ¶ 42.) At 10:05 a.m. ET on August 6, Klein logged into his online brokerage account and placed a limit order[3] to sell 100,000 shares of Ampio stock—his entire position—at $2.85 per share. (*Id*.) Nine minutes later, Klein cancelled his limit order and replaced it with a limit order to sell the shares at $2.81 per share. (*Id*.) For more than an hour, Klein was unable to sell his Ampio stock because his limit price was too high. (*Id*.)

At 11:17 a.m. ET on August 6, Klein cancelled his limit order and replaced it with a market order.[4] (Compl. ¶ 43.) Within 30 seconds of placing that market order, Klein successfully sold his entire position of Ampio stock held at his brokerage firm based on the material nonpublic information that Eduardo had unlawfully conveyed to him. (*Id*.) By selling all of his Ampio stock, Klein avoided losses of approximately $206,974. (*Id*. ¶ 44.)

### LEGAL STANDARDS

Section 21A of the Insider Trading and Securities Fraud Enforcement Act of 1988 gives district courts discretion to impose civil penalties totaling up to "three times the profit gained or loss avoided as a result of" the violative trades. 15 U.S.C. § 78u-1(a)(2). These harsh penalties

---

[3] A limit order is an order to buy or sell a security at a specified price or better. (Compl. ¶ 42.)

[4] A market order is an order to buy or sell a security immediately at the market price. (Compl. ¶ 43.)

"are designed to deter future violations of the securities laws and thereby further the goals of 'encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.'" *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (quoting *SEC v. Palmisano*, 135 F.3d 860, 866 (2d Cir. 1998)).

Civil penalties "shall be determined by the court in light of the facts and circumstances." 15 U.S.C. § 78u-1(a)(2). "[T]he actual amount of the penalty [is] left up to the discretion of the district court." *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005). Second Circuit courts examine a number of factors in determining the appropriate penalty, namely:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007); *see also SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d Cir. 2019) (using *Haligiannis* factors).

## DISCUSSION

The SEC requests a civil penalty against Eduardo of $875,216 and a civil penalty against Klein of $517,435. (Pl.'s Mem. at 8.) Eduardo argues that the penalty sought by the SEC against him "is far greater than necessary to achieve the purposes of punishment and deterrence under federal securities law." (Eduardo Opp. Mem. at 2.) Klein argues for a penalty "towards the lower bound of the penalty range, and significantly lower than the sum of $517,435 sought by [the SEC]." (Klein Opp. Mem. at 24.) The Court separately considers the fine against Eduardo and Klein.

I.  **Civil Penalty Against Eduardo**

A.  ***Haligiannis* Factors**

In arriving at its recommended penalty amount against Eduardo, the Court begins by applying the *Haligiannis* factors. With respect to egregiousness, Eduardo notes that he "was not a securities professional" and "engaged in three individual trades on one day of his life," and argues that "[t]hese were singular, isolated violations, and not part of any greater pattern of insider trading." (Eduardo Opp. Mem. at 11.) Although a "single insider trading violation is not a *per se* egregious offense,"[5] in this case, in addition to insider trading himself, Eduardo also tipped Klein in order that Klein too could engage in insider trading. As such, although Eduardo was not part of a massive insider trading scheme evincing a high degree of flagrant behavior,[6] the egregiousness factor weighs modestly towards a higher penalty against Eduardo.

With respect to the second *Haligiannis* factor, the record reflects that Eduardo acted with a high degree of scienter. Knowing that Pablo had shared material, nonpublic information with him that was highly confidential, Eduardo sold nearly all of his and his wife's shares of Ampio stock and thereafter called Klein to pass on the information so that Klein also could trade on it. (Compl. ¶¶ 32, 37-41.)[7] This factor weighs towards a higher penalty against Eduardo.

With respect to the third *Haligiannis* factor, the SEC proffers no evidence with respect to the quantum of losses (or risks of losses) to other persons that Eduardo's conduct created to

---

[5] *SEC v. Carr*, No. 18-CV-01135 (SRU), 2020 WL 13303131, at *4 (D. Conn. Jan. 10, 2020) (citing *SEC v. Jacobs*, 2014 WL 12768507, at *2-3 (N.D. Ohio Dec. 3, 2014)).

[6] As the SEC notes in its memorandum, "egregious" is defined as, among other things, "flagrant." (Pl.'s Mem. at 10 (citing BLACK'S LAW DICTIONARY 229 (2d pocket ed. 2001)).)

[7] Eduardo asserts that "his primary motivation was to ensure that he had funds for his daughter's home payment." (Eduardo Opp. Mem. at 11.) As the SEC notes, such a motivation is irrelevant. (Pl.'s Reply at 9.)

determine whether or not they were substantial. "When an insider trades on the basis of material, non-public information, the insider usually does not cause any price inflation or deflation." *United States v. Rajaratnam*, No. 09-CR-01184 (RJH), 2012 WL 362031, at *6 (S.D.N.Y. Jan. 31, 2012). For example, "when a stock declines after a company announces worse than expected earnings or rises when a company announces better than expected earnings, the decline or rise itself does not result from the defendant's insider trading." *Id*. In the present case, based upon the record before the Court, Eduardo's "behavior did not impose any extraordinary risk of loss to others outside of the generalized risk of delegitimizing securities markets presented by 'trading on misappropriated information.'" *SEC v. Yang*, No. 20-CV-04427 (FB) (RER), 2022 WL 16715912, at *2 (E.D.N.Y. Nov. 4, 2022) (quoting *United States v. O'Hagan*, 521 U.S. 642, 659 (1997)). Thus, the third factor weighs towards a lower penalty against Eduardo.

As to the fourth *Haligiannis* factor, Eduardo did not engage in a pattern of insider trading. Nevertheless, Pablo and Eduardo had a long history of communicating about Ampio and its stock, including the sharing of material, nonpublic information and Eduardo routinely shared with Klein the information he learned from Pablo. (*See* Compl. ¶¶ 31-36.) This factor weighs modestly towards a higher penalty against Eduardo.

With respect to the fifth and final factor, *i.e.*, whether the penalty should be reduced due to Eduardo's demonstrated current and future financial condition, Eduardo provided a sworn accounting to the SEC. (Eduardo Opp. Mem. at 9, 12.) Although the SEC asserts that the accounting was incomplete, the SEC acknowledges that a civil penalty will impose a personal hardship. (*See* Pl.'s Reply at 9-10.) Nevertheless, the SEC asserts, and the arguments presented by Eduardo do not contradict, that Eduardo "has sufficient assets to satisfy a monetary judgment

9

in the amount of the civil penalty requested by the SEC." (Pl.'s Mem. at 13; *see also* Eduardo Opp. Mem. at 12-13.) Thus, the fifth factor weighs towards a higher penalty against Eduardo.

B.  **Size Of Penalty**

The SEC seeks a civil penalty against Eduardo of $875,216, representing two-and-a-half times his own losses avoided (*i.e.*, $225,902 x 2.5 = $564,755) and one-and-a-half times Klein's losses avoided (*i.e.*, $206,974 x 1.5 = $310,461). (*See* Pl.'s Mem. at 8.) As a starting point, the penalty against Eduardo should be greater than that imposed upon Pablo, who agreed to pay a civil penalty of $225,902 (*i.e.*, 1x the losses avoided by Eduardo himself). Pablo, unlike Eduardo, did not himself engage in any stock trading. In addition, Pablo agreed to settle with the SEC before this action was commenced (Pl.'s Reply at 7), whereas Eduardo waited until after the action was filed and preliminary discovery was conducted. (Pl.'s Mem. at 7.) Finally, Eduardo's illegal conduct also resulted in the losses avoided by Klein.[8]

In arriving at the precise amount of the penalty to be imposed against Eduardo, the Court takes note that two of the *Haligiannis* factors (*i.e.*, the first and fourth) weigh modestly towards a higher penalty, two of them (*i.e.*, the second and fifth) weigh towards a higher penalty and one of them (*i.e.*, the third) weighs towards a lower penalty. However, "the *Haligiannis* factors . . . have not been deemed an exhaustive list by [the Second Circuit] and are not to be taken as talsimanic." *Rajaratnam*, 918 F.3d at 45 (citations omitted); *see also SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) ("While these factors are helpful in characterizing a particular

---

[8] The Second Circuit has explained that a civil penalty is not limited to a defendant's personal profit gained or loss avoided. *See Rajaratnam*, 918 F.3d at 42-43.

10

defendant's actions . . . each case has its own particular facts and circumstances which determine the appropriate penalty to be imposed." (quotation marks omitted)).[9]

The penalty sought by the SEC against Eduardo appears to the Court, in its discretion, to be excessive, viewing the record in its entirety. The Court places significance on the fact that Pablo has accepted responsibility for his actions by agreeing to a consent judgment. *Cf. SEC v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002) (affirming trial court's consideration of defendant's failure to accept responsibility in assessing civil penalty, Seventh Circuit stated that "acceptance of responsibility for illegal conduct is a routine and unexceptionable feature even of criminal, let alone of civil, punishment"). In addition, the Court has considered Eduardo's expression of remorse.[10] *Cf. SEC v. Tourre*, 4 F. Supp. 3d 579, 596 (S.D.N.Y. 2014) (considering lack of remorse or contrition in assessing civil penalty). Mindful that "SEC civil penalties . . . are designed to effect general deterrence and to make insider trading a money-losing proposition," *Rajaratnam*, 918 F.3d at 41, and after consideration of all the arguments set forth by the parties, the Court recommends that a civil penalty of $545,827 be imposed against Eduardo, representing one-and-a-half times his own losses avoided (*i.e.*, $225,902 x 1.5 = $338,853) and one times Klein's losses avoided (*i.e.*, $206,974 x 1 = $206,974).

---

[9] The Court has reviewed the various decisions cited by the parties imposing civil penalties in other cases. However, as alluded to by the court in *Opulentica, LLC* , 479 F. Supp. 2d at 331, no two cases are alike, and the personal circumstances of individual defendants differ, such that penalties imposed by courts in their discretion in other cases, while instructive, are of limited utility.

[10] "Eduardo Rubinstein made a single error of judgement five years ago, which he deeply regrets. He will never do it again." (Eduardo Opp. Mem. at 13.)

## II. Civil Penalty Against Klein

### A. *Haligiannis* Factors

In arriving at its recommended penalty amount against Klein, the Court also begins by applying the *Haligiannis* factors. With respect to egregiousness, Klein argues that his conduct "involv[ed] a one-time sale of stock in a single company by a remote tippee, who did not work in the financial industry and did not seek to pass the information on to others or maximize his own financial gain, [and thus] was not highly egregious." (Klein Mem. at 6.) Klein further argues that his conduct was "considerably less egregious than in other insider trading cases in this Circuit, which show repeated conduct on a large scale by insiders or financial industry professionals." (*Id*.) In reply, the SEC argues that Klein's conduct was egregious because he did not simply liquidate his shares on August 6, 2018 after receiving the tip from Eduardo, but rather placed two limit orders to sell his Ampio stock above the market price. (*See* Pl.'s Reply at 1-2 (citing Compl. ¶ 42).) The SEC notes that Klein liquidated his Ampio stock through a market order only after he was unable for more than an hour to sell his stock above the market price. (*See id*. at 2 (citing Compl. ¶ 43).)

The Court does not place great significance on Klein's initial use of limit orders for a period slightly over an hour, considering all the facts and circumstances. Klein's limit orders placed on August 6, 2018 at 10:05 a.m. and 10:14 a.m. were placed at $2.85 and $2.81 per share, respectively. (Compl. ¶ 42.) Klein then executed his market order at 11:17 a.m. (*Id*. ¶ 43.) Even though during the limited time period in question, the price of Ampio stock was not trading at the level of Klein's limit orders, the price was in that range in the near term. Indeed, as the SEC's Complaint alleges, the next day (*i.e.*, August 7, 2018), the price of Ampio's stock closed at $2.86

12

per share. (*Id*. ¶ 28.) Thus, while Klein's conduct in using limit orders displays some level of greed, the Court finds that such conduct is not reflective of more than a modest level of egregiousness. Thus, the first factor weighs modestly towards a higher penalty against Klein.

With respect to the second *Haligiannis* factor, based upon the facts alleged in the Complaint, which Klein admitted in his consent judgment, Klein had a high degree of scienter. Klein knew that Pablo worked for and had nonpublic information about Ampio and that Pablo shared such information with Eduardo. (Compl. ¶ 34.) In addition, Eduardo and Klein had a history of communicating about Ampio and its securities and dealings with the FDA, and many of these communications contained material nonpublic information that Eduardo had received from Pablo. (*Id*. ¶ 35.) On August 6, 2018, Eduardo unlawfully communicated to Klein material nonpublic information about Ampio, and Klein sold his entire position of Ampio stock based on the material nonpublic information that Eduardo had unlawfully conveyed to him. (*Id*. ¶¶ 41, 43.) Thus, the second factor weighs towards a higher penalty against Klein.

With respect to the third *Haligiannis* factor, as with Eduardo, the SEC proffers no evidence with respect to the quantum of losses (or risks of losses) to other persons that Klein's conduct created to determine whether or not they were substantial. Thus, this factor weighs towards a lower penalty against Klein.

As to the fourth *Haligiannis* factor, Klein also did not engage in a pattern of insider trading. Nevertheless, Klein routinely obtained from Eduardo the inside information about Ampio that Eduardo learned from Pablo. (*See* Compl. ¶¶ 33-36.) This factor weighs modestly towards a higher penalty against Klein.

With respect to the fifth and final *Haligiannis* factor, *i.e.*, whether the penalty should be reduced due to Klein's demonstrated current and future financial condition, Klein did not submit an accounting and thus may not argue that he is unable to pay the requested penalty. (*See* 5/5/23 Joint Ltr., ECF No. 42 at 1 n.1 ("Defendant Mark Klein does not intend to raise any factual issues outside of the complaint or the public record in support of his arguments in favor of a lower civil penalty amount and is not, therefore, submitting an accounting."); *see also* Klein Opp. Mem. at 21 ("Klein does not argue that his present financial situation renders him unable to pay a penalty.").) Thus, the fifth factor weighs towards a higher penalty against Klein.

B.  **Size Of Penalty**

The SEC seeks a civil penalty against Klein of $517,435, representing two-and-a-half times Klein's losses avoided (*i.e.*, $206,974 x 2.5 = $517,435). (*See* Pl.'s Mem. at 8.) As a starting point, as with Eduardo, the penalty against Klein should be greater than that imposed upon Pablo, who agreed to pay a civil penalty of $225,902 (*i.e.*, 1x the losses avoided by Pablo's direct tippee, Eduardo). Pablo, unlike Klein, did not himself engage in any stock trading. In addition, Pablo agreed to settle with the SEC before this action was commenced (Pl.'s Reply at 7), whereas Klein waited until after the action was filed and preliminary discovery was conducted. (Pl.'s Mem. at 7.)

In arriving at the precise amount of the penalty to be imposed against Klein, the Court takes note that two of the *Haligiannis* factors (*i.e.*, the first and fourth) weigh modestly towards a higher penalty, two of them (*i.e.*, the second and fifth) weigh towards a higher penalty and one of them (*i.e.*, the third) weighs towards a lower penalty. However, as set forth above in Discussion Section I.B., *supra*, the *Haligiannis* factors are not exhaustive.

The penalty sought by the SEC against Klein appears to the Court, in its discretion, to be excessive, viewing the record in its entirety. As in the case of Eduardo, the Court places significance on the fact that Klein has accepted responsibility for his actions by agreeing to a consent judgment. Based upon all the foregoing, and considering all the arguments set forth by the parties, the Court recommends that a civil penalty of $310,461 be imposed against Klein, representing one-and-a-half times his losses avoided (*i.e.*, $206,974 x 1.5 = $310,461). This amount, in the Court's view, achieves the twin aims of punishment and deterrence.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that Plaintiff's motion be GRANTED IN PART and DENIED IN PART. Specifically, the Court recommends that a civil penalty of $545,827 be imposed against Eduardo and that a civil penalty of $310,461 be imposed against Klein.

Dated:   July 8, 2023
         New York, New York

_____
**STEWART D. AARON**
**United States Magistrate Judge**

\*          \*          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such

objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Schofield.

**THE FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).